UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| REGAL WEST CORPORATION,<br><br>        Plaintiff,<br><br>    v.<br><br>GRAPECITY, INC.,<br><br>        Defendant.<br><br>GRAPECITY, INC.,<br><br>        Third-Party Plaintiff,<br><br>    v.<br><br>SOFTKETEERS, INC.,<br><br>        Third-Party Defendant. | CASE NO. C11-5415 BHS<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S AND THIRD-PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

    This matter comes before the Court on Plaintiff Regal West Corporation's ("Regal") motion for summary judgment (Dkt. 83), Defendant GrapeCity, Inc.'s ("GrapeCity") motion for summary judgment (Dkt. 78), and Third-Party Defendant Softketeers, Inc.'s ("Softketeers") motion for summary judgment (Dkt. 79).  The Court has considered the pleadings filed in support of and in opposition to the motion and the

remainder of the file and hereby grants GrapeCity's motion and denies Regal's and Softketeers' motions for the reasons stated herein.

## I. PROCEDURAL HISTORY

On June 1, 2011, Regal filed a complaint against GrapeCity for breach of contract. Dkt. 1. On June 23, 2011, Regal filed a first amended complaint. Dkt. 7 ("FAC"). Regal alleges that it contracted with GrapeCity "to develop and implement the technical architecture of an Automated Transportation Management System (ATM) . . . ." FAC, ¶ 3.3.

On January 16, 2013, all three parties filed motions for summary judgment. Dkts. 78, 79, & 83. On February 4 and 11, 2013, the parties responded. Dkts. 92, 95, & 102. On February 8 and 15, 2013, the parties replied. Dkts. 98, 100, & 104.

## II. FACTUAL BACKGROUND

Regal is a warehousing and logistics provider. Dkt. 59, Declaration of Randy Neeves ("Neeves Decl."), ¶ 2. Regal utilizes a Warehouse Management System ("WMS") to keep track of where in the various warehouses different products are shelved, to aggregate products from different manufacturers into shipments to retailers, and to create bills of lading for the shipments. *Id*. ¶ 4. For several years after the WMS went into operation, Regal employees would manually check the rates offered by different freight carriers to determine the most favorable rate for a particular shipment. The Regal employees would use the bills of lading generated by the WMS as the basis for the information needed to do the manual assessment of rates. *Id*. ¶ 9.

In 2008, Regal contracted GrapeCity to develop an ATM system. *Id.* ¶ 10–11. The written "contracts" applicable to GrapeCity's design and development of the ATM software were entitled "Statements of Work" ("SOWs"). GrapeCity has submitted four SOWs. The first SOW outlined the scope of the deliverables, a schedule, an estimated budget, and other provisions. Dkt. 85, Declaration of William H. Walsh ("Walsh Dec."), Exh. 2. The "Scope of Work" provision provides as follows:

> GrapeCity will perform the following activities:
> 1. Capture High Level Requirements
> 2. Develop Solution Architecture
> 3. Develop a user interface prototype for key functionality
> 4. Develop Master Schedule
> 5. Prepare Effort and Cost estimates for rest of the project

*Id.*, § 2.2. The "Acceptance Criteria" provision provides as follows:

> GrapeCity will deliver interim version of each Deliverable for Regal Logistics review. GrapeCity will incorporate the feedback and review updated version with Regal Logistics. The final version of all Deliverables will be delivered at the end of project and all Deliverables will be deemed as accepted on final delivery to Regal Logistics.

*Id.*, § 2.4.

On October 13, 2008, Regal's CEO, Randy Neeves, signed an "Acceptance Certificate." *Id.*, Exh. 10. The certificate provides as follows:

> **Project Name**
> Regal ATM - SOW#1.0
>
> **Project Phase**
> Inception Phase for Regal ATM System.
>
> **Deliverables**
> 1. High Level Requirements
> 2. Solution Architecture
> 3. Prototype Screens

ORDER - 3

> 4. Effort and Cost Estimates for rest of the project
> 5. Master Schedule
>
> **Acceptance Certificate**
> By signing this Acceptance Certificate, Regal Logistics agrees that GrapeCity has delivered all Deliverables outlined in Regal logistics SOW#1.0 _Inception Phase_ 2008-08-13, and Regal Logistics has found that these Deliverables meet the Acceptance Criteria.

*Id*.

On October 11, 2008, Mr. Neeves signed SOW #2, which required GrapeCity to "code, test and deliver the software" for the system. *Id*., Exh. 3 ("SOW #2") § 2.2. Under SOW #2.0, Regal agreed that GrapeCity would develop the ATM incrementally in four "iterations" (Iteration 1, 2, 3 and 4), or phases. For each iteration, GrapeCity had a specific set of "deliverables" it was contractually required to produce: (1) "Detailed Requirements Specifications"; (2) "Updated User Interface Prototype"; (3) "Detail Design Specifications"; and (4) "Executables." *Id*., §§ 3.1–3.4. Sections 3.1 and 3.3 of SOW #2.0 identified the specifics of what (detailed requirements) and how (detailed design) GrapeCity would build the software in each iteration. *Id*. The agreement required GrapeCity to submit the design documents for the software applicable for that iteration before GrapeCity started work on each iteration. *Id*., § 2.3. After Regal had an opportunity to review and approve the documents, GrapeCity would begin developing the software and website. *See, e.g., id.* Exh. 13.

Section 3.2 identified as a GrapeCity deliverable, the website, or user interface ("UI"), through which a person would get shipping quotes and book a shipment. SOW #2.0, § 3.2. Section 3.4 required GrapeCity to deliver the ATM code. *Id*. § 3.4.

ORDER - 4

GrapeCity delivered UI and ATM code to Regal for each iteration. *See id.* Exh. 14. After GrapeCity's delivery, Regal had the responsibility for testing and accepting each iteration's UI and ATM code (called User Acceptance Testing or "UAT"). SOW #2.0, § 5. The parties agreed upon the dates and duration for Regal's UAT as part of the Master Schedule for SOW #2.0, with the parties conducting Iteration 4 UAT in SOW #3.0, not SOW #2.0. SOW #2.0, § 8; Walsh Dec., Exh. 9, Change Order #1.0 for SOW #2.0.

Under the agreement, UAT was Regal's responsibility and opportunity to test-drive the software. To perform UAT, Regal had an operations team who tested each iteration's code and UI. The agreement stated that Regal was obligated to timely identify in writing any problems Regal found with the code or UI. SOW #2.0, § 5.1. In each contract, Regal identified Randy Neeves as the person "responsible for coordinating the review and acceptance of Deliverables within Regal." *See, e.g., id.*, § 5. Each contract also specified that if Regal did not timely review and notify GrapeCity of errors in GrapeCity's work-product, the work-product was deemed accepted by Regal:

> Randy Neeves, Regal Logistics Project Manager/CEO, is responsible for coordinating the review and acceptance of Deliverables within Regal Logistics. It is expected that interim/draft and final documents will require review. Final deliverables will require formal acceptance and will follow the following process:
> 1. Regal Logistics shall provide written acceptance for each Deliverable as per the schedule defined in the Master Schedule for this SOW, or provide a detailed written explanation defining reason(s) for non-acceptance.
> 2. If there is no response from Regal Logistics as per the UAT schedule defined in the Master Schedule, or ten (10) days from the date the Deliverable was submitted to Regal Logistics in case the date is not defined in Master Schedule, then the Deliverable shall be deemed accepted.
> 3. When GrapeCity re-submits a non-accepted Deliverable, Regal Logistics shall have ten (10) days to accept or reject the Deliverable, and

ORDER - 5

such review shall be limited to only those items identified as non-accepted in the original review.

SOW #2.0, § 5.

GrapeCity contends that it "fully, and timely, delivered all four iterations of the ATM software, with GrapeCity delivering the functioning website www.appiaway.com and all executables under Iteration 4, on June 11, 2009." Dkt. 78 at 8 (citing Walsh Dec., Exh. 14. GrapeCity also contends that "**Regal never timely notified GrapeCity, in writing or otherwise, that GrapeCity's deliverables under those iterations failed to meet Regal's approval.**" Dkt. 78 at 9 (emphasis in original).

After SOW #2.0, the parties executed SOW #3.0. The period of this SOW began on June 12, 2009 (the day after GrapeCity delivered the ATM software and website to Regal), and ended on December 31, 2009. Walsh Dec., Exh. 5 ("SOW #3.0") § 5. Under SOW #3.0, Regal asked GrapeCity to help Regal run the ATM system, which contractually amounted to four deliverables: (a) develop a demonstration video for the ATM website, (b) support Regal during Iteration 4 UAT, (c) help maintain the system while Regal was running it in "production" (processing actual shipments), and (d) provide additional software development that Regal identified (adding additional features or carriers to the website). *Id*., § 2.2. Similar to SOW #2.0, SOW #3.0 had several acceptance provisions, one that applied to new development work and one that applied to any deliverable for SOW #3.0:

> Deliverables and Acceptance Criteria. For development work, at the end of every sprint an executable copy of the code that implements all requirements defined for the Sprint will be delivered to Regal Logistics. Regal Logistics will test the executables as per the User Acceptance Testing

schedule defined in the project schedule. The Executables will be deemed as accepted if the code is known to be free of Critical and Major defects that are captured in the defect-tracking tool during the User Acceptance phase.

All Deliverables of this SOW will be deemed accepted on delivery unless Regal Logistics provides a written explanation describing reason(s) of non-acceptance. When GrapeCity re-submits a non-accepted Deliverable, Regal Logistics shall have ten (10) days to accept or reject the Deliverable, and such review shall be limited to only those items identified as non-accepted in the original review.

*Id.*, §§ 3.4, 3.5.

In June of 2009, Regal involved Softketeers in the ATM project. Dkt. 97, Declaration of Margaret Pak ("Pak Dec."), Exh. 4, Deposition of Himardi N. Choudhury at 90. Mr. Choudhury asserts that once Softketeers' CEO, Minh Nguyen, became involved in the ATM project things began to turn "sour." *Id.* at 91.

In SOW #3, Regal and GrapeCity agreed that Regal would identify a prioritized list of items it wanted GrapeCity to work on. *Id.* § 3.1. Regal's "to-do" list was separated into Sprints. *Id.* Sprint 1 development occurred from June 11 to June 30, 2009. *Id.* § 9. GrapeCity produced Sprint 1's deliverables to Regal on July 2, 2009. Walsh Dec., Exh. 19. In conjunction with Iteration 4 UAT, Regal conducted UAT for Sprint 1 closing both UATs on September 18, 2009 without reporting any issues. *Id.*, Exh. 20. GrapeCity contends that "Regal accepted, expressly, or by operation of contract, GrapeCity's deliverables under SOW #3.0." Dkt. 78 at 10 (citing Walsh Dec., Exhs. 17, 20, & 21).

On October 13, 2009, the parties memorialized Regal's "to-do" list into three more Sprints – Sprint 2, Sprint 3, and Sprint 4. Walsh Dec., Exh. 22 ("Change Order #1.1").

GrapeCity produced Sprint 2's deliverables to Regal on November 12, 2009, and Regal tested GrapeCity's work-product under Sprint 2 without identifying any issues. *Id.*, Exh. 23. GrapeCity contends that "Regal never notified GrapeCity, in writing or otherwise, that GrapeCity's Sprint 2 deliverables failed to meet Regal's approval." Dkt. 78 at 11.

On December 15, 2009, the parties executed SOW #3.1, which was a second six-month maintenance contract with GrapeCity lasting from January through June 2010. Walsh Dec., Exh. 6 ("SOW #3.1"), § 5. SOW #3.1 was similar to SOW #3.0, in that GrapeCity agreed to continue ongoing software development of features that Regal had identified and prioritized as Sprints 3 and 4. *Id*. §§ 2, 3. GrapeCity produced Sprint 3 and Sprint 4's deliverables to Regal on November 20, 2009 and January 13, 2010 (Sprint 3) and February 15, 2010 (Sprint 4). Walsh Dec., Exh. 25. GrapeCity contends that "Regal tested GrapeCity's work-product under Sprint 3 and Sprint 4 without raising any issues." Dkt. 78 at 11–12.

In January 2010, Mr. Neeves and Mr. Nguyen discussed problems with GrapeCity's code in the ATM system. Pak Dec., Exhs. 23–25.

Regal terminated GrapeCity on March 2, 2010 before SOW #3.1 ended. Walsh Dec., Exh. 7.

### III. DISCUSSION

**A.    Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory,

1  nonspecific statements in affidavits are not sufficient, and missing facts will not be

2  presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

3  **B.     The Contract**

4        Regal moves for partial summary judgment on the issue of liability (Dkt. 83), and

5  GrapeCity moves for summary judgment on both liability and damages (Dkt. 78).  In

6  Washington, a breach of contract claim requires a showing of "(1) a contract that

7  imposed a duty, (2) breach of that duty, and (3) an economic loss as a result of that duty."

8  *Myers v. State*, 152 Wn. App. 823, 827–828 (2009).

9        The first issue the parties dispute is the duty imposed by their contract.  Regal

10 contends that it "is undisputed that when Regal contracted with GrapeCity for the

11 development, implementation, and maintenance of an ATM system, the rate engine was

12 the heart of that system." Dkt. 102 at 3.  With respect to the contract as a whole, Regal

13 contends that "the contract between Regal and GrapeCity took place over 18 months and

14 Regal paid GrapeCity over $1.6 million for a working ATM system." *Id*. at 15.

15 Although there is evidence of a continuing relationship between Regal and GrapeCity,

16 the evidence in the record shows that the relationship consisted of four different SOWs.

17 Moreover, each SOW outlined specific deliverables, identified dates to begin and deliver

18 the deliverables, and compensation amounts for the deliverables.  Therefore, the Court

19 concludes that the contractual duties were imposed pursuant to each separate SOW.

20       Based on this conclusion, the scope of Regal's breach of contract claim is

21 significantly narrowed.  GrapeCity contends that

22

> Regal does not seriously contest that GrapeCity delivered, and Regal accepted, all deliverables under SOW #1.0, and Regal cannot, because Regal's own expert expressly admitted GrapeCity satisfied SOW #1.0. [Walsh Dec., Exh. 11] 142:6-9; 3 146:4-9. Regal agrees that GrapeCity delivered, and Regal accepted, all deliverables under SOW #2.0 except for the rate engine software. Regal does not challenge that GrapeCity delivered, and Regal accepted, all software deliverables under SOW #3.0 and #3.1, that GrapeCity assisted Regal in UAT for Iteration 4, or that GrapeCity delivered a functioning website demonstration video (both SOW #3.0 deliverables).

Dkt. 104 at 2–3. The Court agrees as Regal's response concentrates on the rate engine that was part of SOW #2. *See* Dkt. 102 at 7–12. Therefore, the Court grants GrapeCity's motion on SOWs #1, #3, and #3.1.

The next issue is whether Regal accepted the code pursuant to the acceptance provision regardless of whether the rate engine was faulty. GrapeCity contends that the rate engine was part of Iteration 1 of SOW #2 whereas Regal argues that the rate engine was part of Iteration 2. If the rate engine was part of Iteration 1, Mr. Neeves signed an acceptance certificate of Iteration 1. Walsh Dec., Exh. 16. Therefore, the Court grants GrapeCity's motion as to SOW #2, Iteration 1 because GrapeCity has shown that it fulfilled its obligations with respect to this aspect of the contract.

With respect to SOW #2, Iteration 2, Regal argues that it never signed off on this portion of the project and it notified GrapeCity of the problems with the rate engine. Dkt. 102 at 11–14. GrapeCity has submitted evidence that Iteration 2 was delivered, tested, and signed off on. Walsh Dec., Exh. 4 ("UAT for iteration 2 was successfully completed without any major issues. UAT was signed off by Regal Logistics on 5/8/09.").

GrapeCity, however, has failed to submit a document showing that Mr. Neeves signed off on Iteration 2.

Mr. Neeves as well as other Regal employees claim that the Iteration 2 code never worked. *See* Dkt. 102 at 11–12. However, even if there were problems with this code, Regal has failed to submit any evidence that it notified GrapeCity in writing of any problem with the code. On this issue, the SOW is clear:

> If there is no response from Regal Logistics as per the UAT schedule defined in the Master Schedule, or ten (10) days from the date the Deliverable was submitted to Regal Logistics in case the date is not defined in Master Schedule, then the Deliverable shall be deemed accepted.

SOW #2, § 5.2. The failure to submit written evidence, as opposed to self-serving testimony, is determinative. Therefore, the Court grants GrapeCity's motion on this final issue and grants summary judgment for GrapeCity on Regal's breach of contract claim. The Court also denies Regal's motion for summary judgment on liability.

C.  **Softketeers' Motion**

A claim of tortious interference requires "(1) the existence of a valid contractual relationship of which the defendant has knowledge, (2) intentional interference with an improper motive or by improper means that causes breach or termination of the contractual relationship, and (3) resultant damage." *Elcon Canst. Inc. v. Eastern Washington Univ.*, 174 Wn.2d 157, 169 (2012).

In this case, Softketeers moves for summary judgment arguing that any negative comment was made post termination of Regal, there is no evidence of improper motive, and there is no evidence of improper means. With respect to the timing of comments,

1  GrapeCity has submitted evidence of comments made prior to GrapeCity's termination.
2  Dkt. 95 at 9. Softketeers counters that "[n]othing in this evidence will support an
3  inference that Softketeers tried to influence Regal, let alone an inference that Regal was
4  influenced against GrapeCity." Dkt. 98 at 6. Taking the evidence in the light most
5  favorable to GrapeCity, the non-moving party, the Court disagrees with Softketeers and
6  finds that material questions of fact exist whether this precontract termination
7  involvement by Softketeers was a cause of the termination of the contract between Regal
8  and Grapecity.

9  With regard to improper motive, Softketeers argues that "there is no evidence that
10 Softketeers acted with an improper motive." Dkt. 79 at 11. Softketeers' argument is
11 based upon the defense of legitimate business competition and protecting its financial
12 interests. *Id*. at 11–13. The problem with Softketeers' arguments is that it is based on
13 what it considers the "most reasonable" inferences to be drawn from the evidence. While
14 the Court agrees that Softketeers presents what appears to be reasonable inferences,
15 taking the evidence in the light most favorable to GrapeCity, a reasonable juror could
16 conclude that Softketeers acted with an improper motive. Therefore, the Court denies
17 Softketeers' motion because questions of fact exist on this issue.

18 With regard to improper means, Softketeers argues that GrapeCity has not
19 provided any evidence that Softketeers' statements to Regal were false. GrapeCity,
20 however, has adequately shown that questions of fact exist as to the falsity of Softketeers'
21 representations. For example, there is a question of fact whether the code was "faulty" as
22 opposed to trivial, routine bug fixes. Dkt. 95 at 18. Additionally, GrapeCity asserts that

1  Softketeers "plaguerized GrapeCity's software." If true, it is evidence that Softketeers
2  made intentionally false statements. Dkt. 95 at 19-20. Therefore, the Court denies
3  Softketeers' motion because material questions of fact exist on GrapeCity's claim.

## IV. ORDER

Therefore, it is hereby **ORDERED** that Regal's motion for summary judgment (Dkt. 83) and Softketeers' motion for summary judgment (Dkt. 79) are **DENIED** and GrapeCity's motion for summary judgment (Dkt. 78) is **GRANTED**.

Dated this 19th day of March, 2013.

BENJAMIN H. SETTLE
United States District Judge